Filed 6/29/15  P. v. Walker CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STANLEY WALKER,<br><br>Defendant and Appellant. | A139245<br><br>(Contra Costa County<br>Super. Ct. No. 05-130345-2) |

Appellant Stanley Walker was convicted, following a jury trial, of second degree robbery.  On appeal, he contends the trial court erred when it refused to dismiss a prospective juror for cause and denied him additional peremptory challenges.  This, according to appellant, resulted in the seating of an incompetent juror, in violation of his state and federal constitutional right to trial by an impartial jury.  We shall affirm the judgment.

## PROCEDURAL BACKGROUND

Appellant was charged by information with one count of second degree robbery. (Pen. Code, §§ 211/212.5, subd. (c).)

At the conclusion of a jury trial, the jury found appellant guilty as charged.

On June 18, 2013, the trial court placed appellant on probation for three years.

On July 17, 2013, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

Aristotle Rivera  testified that, on the morning of February 4, 2013, he went to the Antioch Skatepark to try to learn how to skateboard.  While Rivera was skating alone at

1

the park, appellant and another person, who was smaller than appellant, walked in. After making eye contact with them, Rivera got scared and turned away. When he turned to look at them again, he saw that the smaller person was going through his backpack, which he had left on a bench near the entrance to the park. Rivera said in a loud voice, " 'Hey that's my bag,' " and appellant, who was standing right next to the other person, responded, " 'I know, I know.' "

Rivera, who felt cornered because the two people were between him and the only exit from the skate park, said there was nothing in the backpack except food and water. When they did not respond, he asked, " 'Look, what do you guys want?' " The smaller person said, "[w]e want what's in your pockets," which made Rivera feel even more afraid and vulnerable. Rivera then said that he did not have any cash, but that he did have a phone in his pocket. The smaller person said, " 'Okay, show it.' " Rivera understood this to mean that they wanted his phone, so he took it out of his pocket and placed it on a ledge. He did this because he did not want to get hurt.

Appellant and the smaller person walked toward Rivera, and the smaller person picked up his phone. Appellant was holding Rivera's fleece sweater, which Rivera had left on the bench next to his backpack. The smaller person asked Rivera what else he had in his pockets and whether he had a wallet. Rivera said he had no cash, but appellant said, " 'Well, maybe there'll be something that I can swipe.' " Rivera, who believed appellant was referring to a credit card, gave his wallet to the smaller person, who, after seeing that there was no cash inside, gave it back to Rivera.

Appellant and the smaller person started to walk away. As they were leaving, appellant said, " 'Oh, a Toyota,' " referring to Rivera's car keys, which had been in his sweater. Rivera pleaded with them not to take the car, which belonged to his wife, and the smaller person told appellant to give the car keys back to Rivera. Appellant rubbed the keys on the inside of his shirt and then dropped them on the bench near Rivera's bag. As the two of them walked away with Rivera's cell phone, the smaller person said, " 'We don't want any problems. Don't tell anyone.' " After they left, Rivera went to a nearby community center, where he used the telephone to call the police.

About 30 minutes later, police officers drove Rivera to a location where he identified appellant as the taller robber. He also identified another person as the smaller robber. When Rivera got his phone back, the SIM card was missing and was never located.

Antioch Police Officer Nicholas Ward testified that he brought Rivera to a location where three individuals had been detained. A black iPhone 4 was recovered from appellant's front left pants pocket; the SIM card was missing.

## DISCUSSION

Appellant contends the trial court erred when it refused to dismiss a prospective juror for cause and denied him additional peremptory challenges, which he asserts resulted in the seating of an incompetent juror, in violation of his state and federal constitutional right to trial by an impartial jury.

### A. *Trial Court Background*

During jury voir dire, Prospective Juror L.E. told the trial court that his brother had been killed by a neighbor and his grandmother was beaten and raped at age 85. The man who killed L.E.'s brother spent 13 months in jail and was released "for time served." The man who attacked his grandmother "got away." L.E. was not happy with the outcome of either incident but, when asked if it would affect his ability to be fair or impartial in this case, he responded, "Probably not," and added that he believed he could be impartial.

When the prosecutor subsequently asked L.E. where he would get the law from in the case, he said, "From here. [¶] . . . [¶] From what you tell us or what the judge has explained to us." When asked if he would follow the law as the court explained it, L.E. said, "As best I can," later clarifying, "If I understand it properly, yes." He also responded, "Yes. Absolutely," to the prosecutor's question as to whether, during deliberations, he would feel comfortable sending a note to ask the judge to explain a concept he did not understand.

Defense counsel asked L.E. whether what had happened to his brother and grandmother was going to be an issue, and L.E. responded, "It shouldn't be. But I can't

3

say it won't be. I was very dissatisfied with the outcome on all of them. The first one, the brother was killed. It was a very disappointing jury how they came to that conclusion. It still baffles me. Without saying too much about it and—he was shot through a door, and they gave the guy 13 months and he walked free. And what happened to myself, if anything happens to this guy, his family then come to arrest us, which I thought was intimidation on their side." When counsel asked if that dissatisfaction would make him lean toward either the prosecution or the defense, L.E. said, "It would probably bias me towards prosecution." Counsel asked if, by bias, he meant that he would be more likely to convict somebody, and L.E. said, "Yes. On the other tragedy on my grandmom's side, the general opinion was it was an illegal alien that probably went back to Mexico and will never catch him. Again, very disappointing." When asked if that experience would also lead him to be biased toward the prosecution, L.E. said, "No. They just didn't have anything to work with." Counsel said, "But the situation with your brother, you feel like that makes you favor the prosecution?" L.E. responded, "Yeah. I think it does."

Later, the court asked if either party "wish[ed] to approach to talk about any cause challenges." Defense counsel asked to approach and, after a sidebar conference that was not reported, the court excused one juror for cause. Defense counsel then used his first peremptory challenge to excuse L.E.

During continued questioning, Juror No. 8 told the court she was robbed at gunpoint in 1986, and the perpetrator was never caught. Her home had also been burglarized and that person was caught. She did not know the outcome, although she heard that the burglar was deported. Juror No. 8's husband had been convicted of a felony when he was a young man, resulting from a fight. The court asked if that incident would cause her any concern about her ability to be fair or impartial in this case, and Juror No. 8, said, "No." Juror No. 8 then told the court that she had several close friends in law enforcement, although not in Antioch. She further stated, "I thought that I could not be fair and impartial, but now that I have heard all this, I understand it better and I feel that I can."

4

After the court excused two more prospective jurors for cause, the prosecutor passed on peremptory challenges, and the court said that the defense was out of peremptory challenges. Defense counsel asked to approach on cause grounds and the court held a sidebar conference, but did not excuse any juror for cause.

In continued questioning of Juror No. 8, the prosecutor asked if she could be fair in this case, to which she responded, "As I said, I can try." She then affirmed that she would base her decision on the facts and the evidence and that she would "hold [the prosecutor] to the law that the judge gives . . . , not something else."

Defense counsel then asked Juror No. 8 if having been robbed at gunpoint would bias her against one side or the other, and if she would be thinking about what had happened to her in 1986 when she heard the testimony in this case. She responded, "No." Counsel also asked Juror No. 8 if she had any concern that she might feel empathy toward someone who "testifies that they are, quote, 'a victim of robbery.' " She responded, "No."

After the prosecutor passed for cause, defense counsel asked to approach. There was another sidebar conference that was not reported, after which the court granted a challenge for cause against another juror.

Subsequently, in a hearing outside of the jury's presence, defense counsel made a record of the challenge for cause against Prospective Juror L.E., which the court had denied. Counsel stated that L.E. had indicated that he would not be fair toward the defense due to events surrounding his brother's homicide, which showed at least implied, if not actual, bias. Counsel further stated that he had used all of his peremptory challenges and requested more, which the court had denied.[1] Counsel averred that, had he more peremptory challenges, he would have challenged Juror No. 8 "based on her

_____

[1] The court later stated that defense counsel had exercised 10 peremptory challenges.

having been a victim of a robbery at gunpoint in 1986."[2]  The court did not specifically discuss either Prospective Juror L.E. or Juror No. 8 during the hearing.

## B.  *Legal Analysis*

The federal and state Constitutions guarantee criminal defendants a fair trial by a panel of unbiased, impartial jurors.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *People v. Black* (2014) 58 Cal.4th 912, 916 (*Black*).)  Each party is allowed an unlimited number of challenges to prospective jurors for cause, which it must use before exercising any peremptory challenges.  (*Black*, at p. 916; Code Civ. Proc., § 226, subd. (c).)  A party may challenge potential jurors for cause on several grounds, including general disqualification, implied bias, or actual bias.  (See Code Civ. Proc., § 225, subds. (b)(1)(A)-(b)(1)(C).)

In this case, appellant claims that both L.E. and Juror No. 8 demonstrated actual bias, which involves "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party."  (Code Civ. Proc. § 225, subd. (b)(1)(C).)

" ' " 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court.  [Citation.]  The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case."  [Citation.]  A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause.  The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence.  [Citation.] . . .  The United States Supreme Court recently

---

[2] Although it appears from the timing of the reported sidebar conferences that defense counsel challenged Juror No. 8 for cause, when counsel later made his record, he did not actually state that he had done so.  Rather, he said that he would have exercised a peremptory challenge against her, had he any left.  For purposes of this appeal, we will assume, as appellant does, that defense counsel did in fact challenge Juror No. 8 for cause.

6

explained: 'Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.' (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.)" (*People v. Hamilton* (2009) 45 Cal.4th 863, 889-890 (*Hamilton*); accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1285; *People v. Horning* (2004) 34 Cal.4th 871, 896; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 489 ["The trial court is present and able to observe the juror itself" and "can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript"].)

In *Black*, *supra*, 58 Cal.4th at page 920, the California Supreme Court described "the correct standard for a defendant to demonstrate prejudice after properly preserving a claim that the defense used peremptory challenges to cure a trial court's erroneous denial of one or more for-cause challenges[:]  A defendant must show that the error affected his right to a fair trial and impartial jury.  When a defendant uses peremptory challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges and an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case.  [Citation.]"

Here, according to appellant, he was prejudiced because, after the erroneous denial of his challenge for cause of biased Prospective Juror L.E., he was forced to use a peremptory challenge against L.E.  He then exhausted his peremptory challenges and the court denied his request for additional peremptory challenges.  Then, after the court denied his for cause challenge against Juror No. 8, he was unable to use a peremptory challenge to remove her, which caused an incompetent juror to serve on his jury.  (See *Black*, *supra*, 58 Cal.4th at p. 920.)  We need not decide whether L.E. was actually biased because we conclude that substantial evidence supports the trial court's implicit finding that Juror No. 8 did not demonstrate actual bias and, therefore, an incompetent juror did *not* sit on appellant's jury.  (See *ibid*.)

7

While Juror No. 8 acknowledged that she had originally been concerned about her ability to be fair and impartial, she stated that she now believed she could be fair and affirmed that she would base her decision only on the facts and evidence presented. To the extent Juror No. 8's answers regarding her impartiality were "conflicting or confusing," it was for the trial court to weigh her responses, along with her demeanor and attitude, in deciding whether to remove her for cause. (See *Hamilton*, *supra*, 45 Cal.4th at pp. 889-890.)[3]

Because there is substantial evidence to support the trial court's finding that Juror No. 8 did not demonstrate actual bias (see Code Civ. Proc., § 225, subd. (b)(1)(C)), appellant was not prejudiced by her presence on the jury that decided his case. (See *Black*, *supra*, 58 Cal.4th at p. 920; *Hamilton*, *supra*, 45 Cal.4th at pp. 889-890.)

## DISPOSITION

The judgment is affirmed.

---

[3] Appellant asserts that Juror No. 8's answer to the prosecutor's question regarding her ability to be fair—that she could "try"—demonstrated actual bias. In context, we do not believe that this statement was particularly equivocal. This case is thus distinguishable from a case cited by appellant, *People v. Bittaker* (1989) 48 Cal.3d 1046, 1089-1090, overruled on another ground in *Black*, *supra*, 58 Cal.4th at page 919, in which a prospective juror initially affirmed her *inability* to be fair and impartial. When the prosecutor later attempted to rehabilitate her by asking if she could listen to evidence and be a fair and impartial juror, she responded, " 'I could try, but I believe it would be difficult. . . . [O]ne of the questions I do remember was about listening to gruesome testimony. And I think I would have a tendency to have a saturation point perhaps below what other people—an anger point, perhaps, or something to that effect. So that I wouldn't be listening wholly to the evidence.' " (*Bittaker*, at p. 1090.) Here, unlike the juror in *Bittaker*, Juror No. 8's statement that she could try to be fair was part of an overall affirmation that she would be able to follow the law and be impartial.

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

9